We're ready to begin with the first case, which is Rouvain v. Lebanese Canadian Bank. Because of the unusual format, I've notified counsel that we'll give you a couple of minutes to start, and we'll try not to interrupt, but sometimes we forget. So about three minutes to start at the beginning, and with that, we're ready to hear Rouvain v. Lebanese Canadian Bank. Good morning, Your Honor. This is Gary Osen of Osen LLC. On behalf of the plaintiff's appellants, we've reserved two minutes for rebuttal. Yes. Thank you. Appellant's brief identifies four key reversible errors in the district court decision below. I'd like to begin this morning by focusing on the district court's misstatement of the governing standard for claims brought under JASTA. The district court held that the state of mind necessary to plead aiding and abetting liability under JASTA required plaintiffs to plead that the defendant, LCB, was generally aware that it was playing a role in the acts of international terrorism that caused plaintiffs' injuries. We don't think that's the correct legal standard, and here's why. Under JASTA, the defendant must be generally aware that it is playing a role in violent or life-threatening activities from which acts of international terrorism are a foreseeable risk. Plaintiffs do not have to plead or prove that the defendant was aware it was playing a role in the primary tort itself, here Hezbollah's rocket attack. In Halberstam, the overall illegal or tortious activity was a criminal enterprise to traffic in stolen goods, not murder. And under JASTA, terrorist activities or life-endangering activities, as the court and Lindy used those phrases, means conduct relating to a terrorist enterprise, not specific terrorist attacks or rockets launched. Halberstam reasoned that personal property crimes committed at night are potentially life-endangering activities because violence and killing are a foreseeable risk of that kind of nighttime illicit enterprise. This was true even though, quote, the amount of the assistance Hamilton gave Welch may not have been overwhelming as to any given burglary in the five-year life of this criminal operation, end quote. That's from Halberstam at page 488. LCB attempts to distinguish Halberstam by arguing that murder is a foreseeable consequence of violent crime like burglary. That's in their brief at page 39. But setting aside whether the defendant in Halberstam even knew specifically about the burglaries, Welch's burglaries did not regularly result in murders. What was critical to the court's analysis was that violence and killing were a foreseeable risk of the couple's nighttime criminal operation. As with property crimes committed at night in Halberstam, Congress has repeatedly reached the conclusion that terrorism financing is life-endangering. First enacting 18 U.S.C. Section 2339A in 1994, excuse me, and criminalizing, among other things, the provision of nonviolent financial services to terrorist organizations. Well, you point to what Congress has said, but I mean, you focus on the right language in Siegel, this general awareness that the defendants, by assisting the principal, will be assuming a role in violent, life-endangering activity. But how is that really alleged here? I mean, you assume that, let's assume that the bank was aware of a connection between, for instance, the foundation and Hezbollah. Is just that factual allegation enough to show a general awareness that by providing financial services to the entities and the individuals, it's playing a role in Hezbollah's violent activities? Your Honor, we would submit that it plausibly alleges playing a role. That is to say, it's not merely our view that financial services to a terrorist organization are life-endangering. In our brief, we quote from Holder v. Humanitarian Law Project, where the Supreme Court specifically cited the executive branch's view that, quote, the experience and analysis of the U.S. government agencies charged with combating terrorism strongly support Congress's finding that all contributions to terrorist organizations further their terrorism, end quote. That's Humanitarian Law Project at page 33. So are there circumstances where material support to a foreign terrorist organization might not be sufficient to plead aiding and abetting under JASTA? Yes. Lindy actually gave an example of that, which was from the same Humanitarian Law Project case, where a party wanted to give advice and counseling to an FTO on how to pursue its political goals in a nonviolent manner. That case and that kind of support might violate Section 2339B, but would not necessarily constitute playing a role in criminal activities. Your complaint, though, goes beyond just—and again, this is a pleadings case, so it's just plausibility at this point in time—but your complaint goes beyond just talking about transactions with one aspect of Hezbollah that may have a neoliamontan or at least from Hezbollah's perspective viewpoint with regard to the support or tensions with regard to injured Hezbollah fighters. But even that, could that even be seen as aiding and assisting in the organization in that it makes it easier to recruit fighters into the future? Well, of course, Your Honor. There are obviously many different kinds of aid and support and many permutations of what a complex organization like Hezbollah does. Clearly, in this case, it's not a very hard call because not only did the bank allegedly provide financial services to a senior Hezbollah leader, one of its principal leaders, and to its in-house bank, but as Your Honor knows, the Martyrs Foundation, which is one of the key institutions here, is part and parcel of Hezbollah's recruitment and subsidization, if you will, of its violence. The whole point of the Martyrs Foundation is to support injured fighters and the families of deceased fighters who have died for the cause. So it's intimately connected to its violence, and that's something which the U.S. government and Congress both recognize on multiple occasions. If I may, I'll turn now briefly to the district court's determination that plaintiffs failed to plausibly plead that LCB knew it was providing financial services to Hezbollah. To begin with, as Your Honor just mentioned a moment ago, this is a pleading case, and even in cases where plaintiffs have to allege fraud under Rule 9b's heightened pleading standard, they are permitted to rely on circumstantial evidence of a defendant's state of mind, and it must logically follow that a plaintiff asserting a jaffa claim under Rule 8 standard can do so as well. Even in cases pleaded under Rule 9, this court is lenient where a defendant's state of mind is concerned, and it views the alleged facts in their totality, not in isolation in determining their adequacy. The allegations here in their totality suggest that it is highly probable, not just plausible, but highly probable that LCB knowingly assisted Hezbollah in life-endangering activities. U.S. government summarized those circumstances, finding that LCB, quote, knowingly conducted business with Hezbollah-controlled entities and individuals. The district court discounted that because of the fact that those findings occurred after the events for which your clients seek compensation, correct? Yes. And what's your response to that? Our response is that, obviously, the U.S. government findings as a notice of that would not give rise to the defendant's knowledge. But the actual findings of that contained in those government findings reference on multiple occasions events and notice events that occurred prior to the attack. For example, and this is at page 102 of the joint appendix, the U.S. government found that the transfers made for the Hezbollah narcotics network began in January of 2006. The U.S. government also found that the cash reporting exemptions for Hezbollah leaders and for several of the Hezbollah banking organizations that they held accounts for, that began in September 2003. Nazim Ahmad, who we mentioned in our brief and who is featured in the government's finding, this individual was identified in a U.N. report in 2002. And more importantly, the U.S. government found that LCB knew about that U.N. report and that in response to that report, LCB's credit department stated, quote, we consider such allegations as part of the propaganda and war launched by the Jewish state against Lebanon, end quote, and then authorized an increase in the credit limits for Mr. Ahmad. All of these facts pre-2006, July 2006, strongly support the inference that LCB knew it was dealing with Hezbollah, actually went out of its way to provide accommodations to allow Hezbollah entities and individuals to get around the cash reporting requirements. Mr. Alshami, one of Hezbollah's leaders, was given a $200,000 a day, a day, exemption from cash reporting requirements. All that cumulatively suggests that LCB knew it was helping and assisting in Hezbollah's criminal enterprise. Thank you. You've reserved two minutes for rebuttal time. Thank you. We'll hear from the appellee. Good morning, Your Honors. This is Jonathan Siegfried. The district court should affirm the decision of the district court. The court, in fact, properly applied this court's decisions in Lindy and Siegel and held that the plaintiffs had failed to allege facts satisfying either the general awareness or knowing and substantial assistance elements. In Lindy and then again in Siegel, the court established a very clear and straightforward pleading standard that the plaintiffs obviously don't like for general awareness. It held that the complaint must allege non-conclusory allegations that a bank was aware that it was playing a role not just in violent or life-endangering activities, but in the violent and dangerous terrorist activities of the FTO. If that could what they are talking about, Your Honors, going back to the material support standard, that is not the standard. We've already said once that the complaint pleaded in aiding a betting claim in Litchi before, haven't we? Not in terms of JASTA, Your Honor. I know you made reference to it in the, well, obviously it was the with all due respect, the dicta portion of- You know what I hear when you say all due respect. Go ahead. Well, Your Honor, I would say that in terms of when you refer to the ATSU, this was a decision that was issued years before the enactment of JASTA, years before there was any guidance from Lindy, and I think it tracks more along the lines of the material support. So we have a different legal standard here, and I think that the court is- What was at issue in Lindy? The sufficiency of the jury charge, which said that material support was enough to constitute a crime of international terrorism, right? It went further than that, of course. Lindy then went on because Mr. Rosen, in fact, tried to make the very same arguments there that he now makes here, that you could look at Bowen, you could look at Holder, and actually that the court should, even if it was going to deny the primary claim, you could take from that jury charge and holding, that the court had found material support that satisfied JASTA. What it said was that material support is not enough to constitute aiding and abetting. In fact, I'll read to you from 229, but aiding and abetting an act of international terrorism requires more than a provision of material support to a designated terrorist organization. That's the sentence that Judge Daniel cited, but he didn't go on. Aiding and abetting requires a secondary actor to be aware that by assisting the principal, it is itself assuming a role in terrorist activities besides help. Such awareness may not require proof of specific intent demanded for criminal aiding and abetting culpability. For example, defendant's intent to participate in a criminal scheme is something that he wishes to bring about or seek his actions, nor does awareness require proof that Arab Bank knew of the specific attacks at issue when it provided financial services to Hamas. What the jury had to find was that in providing such services, the bank was generally aware that it was playing a role in Hamas's violent or life-endangering activities. So I ask you, if a bank regularly exchanges money or does financial transactions, which become apparent that they are the regular source of money transactions for changing, getting U.S. dollars, doesn't the bank have knowledge then that it is a funding source with regard to that terrorist organization? Absolutely not. Absolutely not. And absolutely not because when you have an intermediary, where you have customers that the plaintiffs... But these five customers are alleged to, in the complaint, to be integral parts of Hezbollah itself. And the allegation is that there's public knowledge in Lebanon. There are sites to a lot of publications that establish this connection. And then you also have to look at the unusual nature of the financial transactions themselves. Why wouldn't that be enough at the pleading stage? Sure. So if I can break that up, Judge Levy-Jones, because it's an excellent question. And if we don't break it up, we can come to the wrong conclusion. You've raised the issue about knowledge, and then you've raised the issue about... And then the pleading as to the transactions themselves. So let me deal, if I might, with the knowledge issue. And let's understand that in this complaint, with respect to the knowledge of the integral relationship or the affiliation, what... I know those words are used a lot in the pleading. Those are conclusory words. What are the facts that are alleged about that knowledge? There are two paragraphs, two paragraphs that they admit that there was certainly no U.S. designation prior to the attacks, which is what banks in the real world look to. They look to the OFAC list and to terrorist. So we know there were no designations, and the plaintiffs don't dispute that. So they didn't have noticed that. So the two paragraphs are paragraphs 78 and 79 of this complaint. And paragraph 78 is clearly nothing more than a reference. It's a completely conclusory reference. It says it refers to undated press releases, interviews with unidentified individuals, and unidentified websites, and it doesn't provide any comment as whatever as to what was said in those. So you basically have an allegation, well, there are websites and press interviews, and so it was public knowledge. That is not a factual allegation that you can say, ah, look, there it is. I can see that they must have seen that. So that's paragraph 78. The only other paragraph of this so-called constructive or notorious public knowledge is paragraph 79. Paragraph 79 refers to a bunch of foreign publications with no allegation that those foreign publications were seen or read. And why is that important? Why is the pleading stage, wait a second, why is the pleading stages? I mean, they plugged them. Obviously, they were aware of them. Why do you have to say, so the pleading falls by 1286 because they didn't allege another allegation and we specifically read them? Well, that's because we have to go back, right? So it's spatially insufficient because they didn't plead, we didn't read them? It's more than that, Your Honor, if we can. I'm just saying what you just said. But in 2004 and, we have to go back to where we are. 2004 and 2006, Your Honor, people actually did things like get hard copies of magazines and newspapers. The iPhone, we're all used to the fact that we look at our computers, we look at our mobile devices, and we can look at anything. The iPhone hadn't been invented yet. And the thought, and the idea that back in 2004 or 2006 that the banks, any bank, had programs or that the computers were capable at that point of doing searches for thousands of customers a day to go through anything that might be said in any publication anywhere in the world, the Irish Times, the whatever. It's simply not realistic. If you wanted to make that argument today, and you wanted to talk about things, programs and capabilities and software that you or I or you would expect a bank might have today, fine. But 2004, this wasn't even on the horizon at that point. But if you then, even you step beside that, if you look at those articles, if you read those articles, those articles, and this starts to go, Judge Livingston, to I think the other point that when I said there's two points, knowledge and what they were doing, those articles don't talk about violent or life-threatening activities by that one customer. They talk about the activities of that customer working on, owning and running. I don't understand why, excuse me, I don't understand. This is a pleading. I don't understand why this isn't developed either from discovery and later motion for summary judgment. This is a pleading. I mean, this whole, excuse me, this whole colloquy you go through about the availability and search, et cetera, et cetera. You have a pleading. You have the identification of five individuals. This is not secret. This is not a bank dealing with a bank. This is an assertion of five individuals who have roles and has the law. This is an assertion of ignoring obligations to do due diligence. This is an assertion of ignoring designation because it's some kind of Jewish plot. This is an assertion of raising financial limits to hundreds of thousands of dollars a day for an individual. Why does someone do that? One possible assertion is that they need the money to transfer because they want hard currency. What role would that play? I mean, this is a pleading case. This is not a summary judgment motion. And it is a pleading, and Siegel was a pleading case. And Siegel- Siegel was bank to bank. It makes sense. Siegel was a bank to a customer, and the customer was alleged to have ties to terrorism. It might be a bank, but if you have a charity, and if that charity- Let me ask you a question. Vito Corleone walks into a bank and says, I want to open an account. And Vito Corleone is generally recognized in the community as a member of La Cosa Nostra. Is the bank imputed with that knowledge? Is the- And if the bank does business with Mr. Corleone and continues to raise his wire transfer amounts every day to hundreds of thousands of dollars, does the bank sooner or later figure out that might be playing a role in Mr. Corleone's organization? Well, Your Honor, of course- No, I understand that. Would it have knowledge that Mr. Corleone was a head of a mafia group? Yes. That's fine, Your Honor. And that would be knowledge, but that's not what you have here. We just went back to the point. I have to go back to my point. You don't have any government designation, and you don't even have an article. You don't have an article for four of the customers that says a word prior to 2006 about any affiliation. None of them are designated. And with respect to the one customer with the string of articles that they give you, none of those articles talk about any violent or life-threatening activities. They talk at most about the charitable activities. So why, at a fleeting stage, if you want to say, okay, they've nudged it to the point of saying that they should or could have known of an affiliation, but that doesn't nudge it over the line of saying that there is a factual allegation that any of the transactions were processed for a violent or knowingly processed for a violent or life-endangering activity. And in fact, Your Honor, I think, and I know, obviously, you wrote the... Excuse me. It's difficult because of the phone system. We end up talking over each other. But the problem is that they don't have to know that it's for a violent activity. It only has to be foreseeable to them that a violent activity might arise out of it. In Halberstam, Ms. Hamilton didn't have to know that burglaries were going on. All she had to know was that somehow her boyfriend, her live-in, whatever she was living with the guy, was somehow showing up with new things to sell, and they weren't paying anything for them. So she knew that some kind of larcenous activity, but she didn't have to know the specific underlying type of criminal enterprise at all. All she had to know is that there was some form of larceny going on. And she gets hung with a murder. Your Honor, I think that I won't disagree with the statement that you made. I can't disagree with the statement, but I think it conflates the Halberstam situation with here. Let me ask, do you think the Martyrs Foundation assists in helping recruit Hezbollah fighters? I don't think there is a single allegation in the complaint. I didn't ask that. I asked you a question. Do you think, I'm asking you personally, do you think that by providing support,   the Martyrs Association in some way assists Hezbollah with regard to its recruiting of fighters? In other words, they say to the fighter, you get injured, we'll take care of your family. Do you think that assists them? I think it provides humanitarian assistance to people who are injured. You're not answering my question. Do you think it's reasonably foreseeable that that assists them in recruiting fighters? I think you can say that Hezbollah could benefit from the fact that if it's known that the foundation is tied to Hezbollah and the foundation is doing good works, that people might have a favorable view of Hezbollah. Yes, of course, that stands for a reason, but then that's really, in my opinion, stretching the concept of saying that any, if my question back or my point back would be, let us assume for a second that what you are doing as a bank is you are providing funds for legitimate transactions. You're providing funds for the orphanages or you're providing funds for a school. That does not translate into a bank playing a knowing role in the violent and life-endangering activities in Halberstam. And that's what, to come back to your point about Halberstam, in the Halberstam case, the D.C. court circuit made clear that Halberstam was not secondarily liable to the murder of Dr. Welsh because she provided what the court referred to as normal spousal activities. She was liable because, as it said, she knew full well that he was committing nighttime burglaries in homes and knowingly and willfully aided and abetted those burglaries. So the underlying wrongful act was that she was found to have aided and abetted with the burglaries. And then the court said... But what about the fact that here we have, you know, if we read more charitably, then you would have us read the allegations suggesting a general knowledge of the affiliation between the five customers and Hezbollah. And then irregular transactions, transactions that are more suggestive of possibly assisting in criminal activity as opposed to running a social service foundation of some sort. I mean, at the pleading stage, don't the nature of those monetary transactions have some, you know, go also to show knowledge? Thank you for that question, Your Honor. So money laundering, of course, has come up in a number of cases. Obviously, Siegel. Obviously, in the Seventh Circuit, Kemper. Here, O'Sullivan. Recently, Your Honor, this court affirmed the decision in Zapata where the court made clear that the issue before the court is not money laundering. In that case, money laundering for narcotics traffickers, which I think is exactly the claim in the civil forfeiture complaint that was brought against LCB. You can have money laundering that is for any number of purposes. It could be for sex trafficking. It could be for narcotics trafficking. It can be for any number of things. It could even be, I would concede, for terrorism. And of course, LCB should be responsible and pay the price if, in fact, it was responsible for money laundering. But money laundering isn't, you can't just simply say any criminal activity. JASTA is a terrorism statute. To aid, even if you are aiding and abetting Hezbollah, because Lindy also talks about aiding and abetting directly the FDL, providing banking services directly for the FDL. If providing services directly to the FDL doesn't automatically then mean that it's liable for JASTA, and that's clearly what Judge Wesley actually read that precise language. That's not it. It has to be for the violent and life-threatening terrorist acts. So, the point is, money laundering, sure, there's allegations about money laundering years after the fact. But there's no evidence, again, and back where those were all about it, when you read that complaint fully, it's money laundering in connection with the narcotics trafficking. It's not, you don't say that the bank, so the bank knew about money laundering. Did it know what it was being laundered for? You see these as separate entities, I think, if the narcotics operation is separate and can in any way be seen as part of an overarching or operational scheme. Well, no, it's a simple question. I see money laundering as being its own crime, and I do not find that money laundering is statutory crime, is the same as the crime of international terrorism. So, you say that if they knew that they were laundering money to assist Hezbollah's drug operation, they could not, you could not say that it was reasonably foreseeable that the profits from that drug operation might then go to fund terrorist activities, and so therefore the bank's participation knows that it's actually participating in a broader scheme and playing a role, that being money laundering for the money needs of the various financial operations of the terrorist organization, no matter how the terrorist organization decides to spend its money, is that it? Well, Your Honor, I don't read the money laundering complaint as saying that the money laundering was for Hezbollah's terrorism operation. I see the money laundering as being- Why does it have to be specifically for the terrorist organization? Why can't it just be to assist Hezbollah, knowing that one of the things that Hezbollah does with its money is conduct terrorist operations? Let's take the other part of that. Excuse me, what case or what statute, we're in the statute, is that specificity imposed? Because it just involves an act of international terrorism, and to the extent that when we look, even if you look at the civil forfeiture complaint, what it talks about is the fact that there are these various entities, and in various points it says individuals in those entities are alleged to be affiliated with Hezbollah. It actually doesn't say that this narcotics operation was run for Hezbollah and to provide all of this money to Hezbollah. It actually talks about a lot of people making a lot of money out of international drug trafficking. It does not say that all of these entities, and certainly didn't say at the time, in the 2004 and 2006 period, at the time, that these were known to be Hezbollah-related entities. There is a second part, and I realize I'll run out of time, so if you bear with me. Yes, I'm going to ask you to wrap it up in the next minute or so. Sure, thank you. Let me just also turn to the point about substantial assistance. Briefly, I'm not going to go through all six factors, but there are a couple of very quick, important points to make. There is no allegation here that the bank encouraged the rocket attacks, and the specific attacks are actually important. There does have to be a connection. The general awareness speaks to assisting violent and life-endangering activities in general. But there is, as you note in the footnote, I think it's 10 to the Lindy decision, and certainly when you look closely at the Siegel decision, you will see that there are consistent references to whether there's any connection between the rocket attacks and the bank in terms of knowingly doing something. So when we talk about the fact that, one, there's no allegation that the bank encouraged the attacks, but more importantly, Your Honor, and I'm not sure that in the ATS case that Judge Wesley had the opportunity necessarily to focus on things like the Winograd Commission, which was Israel's own internal investigation after the war into what happened and what went wrong and why. And the Winograd Commission concluded that the rockets were launched by Lebanon only in response to this rather massive land, sea, and air invasion by Israeli forces, and it could have been avoided. And so to say that these rocket attacks were encouraged by the Lebanese Comedian Bank, or that they occurred as a result of the encouragement of any bank for that matter, it's belied by the Winograd Commission. It certainly is belied by the UN Commission report. And it is also the case that these plaintiffs, these plaintiffs who had a full trial involving Hezbollah, Iran, and North Korea in front of Judge Lambert, and who presented evidence regarding the rocket attacks and put on expert witnesses. And fortunately, there are now books and books and books written about this war. What their experts alleged and claimed and what the court found was in quite specific detail that the funding for the rockets, the purchase of the rockets, the installation of the rockets, for the training of the Hezbollah militia who fired the rockets, everything about it was funded by Iran. So there's no- Thank you, Counselor. We went way over time, but we had questions and we'll hear a rebuttal. Thank you, Your Honor. Very briefly, obviously. First of all, with respect to substantial assistance, Halberstam says the defendant must knowingly and substantially assist the primary or principal violation. And then one paragraph later on page 488, it describes that knowledge as Hamilton assisted Welch with knowledge that he had engaged in a legal acquisition of goods. Again, not murder, not knowledge of murder, not even knowledge of burglaries, but acquisition of goods illegally. To the question of whether the support provided as alleged in the complaint is life-endangering activity, I'll just briefly quote again from the Supreme Court decision in Holder v. Humanitarian Law Project. In the executive views of the Supreme Court, given the purpose, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal terrorist function, end quote. That's certainly sufficient in our view for pleading purposes. Lastly, with respect to the defendant's knowledge as alleged, much was made by Mr. to articles. The point of those articles and citing them is that the U.S. government found that the Martyrs Foundation, quote-unquote, openly affiliated with Hezbollah. And these articles contemporaneously suggest that that, in fact, is correct. The media coverage, including English translations of Arabic and Lebanese news sources, cite to events, public events, in 2001 and 2003 in Lebanon, where Hezbollah Secretary General Hassan Nasrallah headlined events for the Martyrs Foundation. Again, this simply indicates the plausibility of the fact that the Martyrs Foundation, to use one example, was openly affiliated with Hezbollah. And then finally, with respect to the other entities and the designation, one of the things that we point to in the complaint, and Mr. Sigfried did not mention paragraph 97 of the complaint at page 64, it specifically notes, and the U.S. government noted this, that even after USIRF, which was one of the banking entities, customers of LCB, even after it was designated as a specially designated global terrorist because of its role in helping finance Hezbollah serving as its unofficial treasury, LCB decided to maintain the relationship with USIRF. Again, that took place after, about a year or less after the rocket attack. But it certainly supports the inference that even when they did have designations in front of them, they chose to continue what they were doing before, which is to support the illicit criminal enterprise of Hezbollah. Thank you. Thank you both. We'll take the matter under advisement. Very well argued. Very helpful arguments. Thank you. The next case is United States.